Jason M. Tangeman, WSB 6-3082
Mitchell H. Edwards, WSB No. 6-3880
Kenna J. Blaney, WSB 8-7098
NICHOLAS & TANGEMAN, LLC
170 North 5th Street, P.O. Box 928
Laramie, Wyoming 82073-0928
(307) 742-7140
*Attorneys for Triarii Technology Solutions*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| TRIARII TECHNOLOGY SOLUTIONS, INC., a North Carolina corporation | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) ) ) | Civil Case No. 23-CV-45-NDF |
| SEAN PAUL JIGOLYK, a resident of Burnaby British Columbia | ) ) ) | |
| Defendant. | ) | |

---

### PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

---

Plaintiff Triarii Technology Solutions, Inc. ("Triarii") files and serves this Brief in support of its Motion for Summary Judgment. Triarii requests that the Court grant summary judgment in its favor on each of their claims for relief.

**A.      INTRODUCTION.**

This action was brought by Plaintiff Triarii Technology Solutions, Inc. ("Triarii") against Defendant Mr. Sean Jigolyk individually alleging claims for breach of contract, breach of the covenant of good faith and fair dealing and fraud. The Defendant Mr. Sean Jigolyk was the owner of a Wyoming company called Real Social Equity Corp. ("RSE"). Mr. Jigolyk was also the individual owner of the intellectual property ("IP") which RSE was attempting to develop and commercialize. To this end RSE entered into an agreement with Triarii called "Real Social Equity

Corp Seed Round Investment Agreement" whereby Mr. Brian Lora and his company Triarii agreed to invest $600,000 in the project and actively participate in the same. Triarii's $600,000 investment was intended to be paid in three "tranches" memorialized in three (3) Simple Agreements for Future Equity or SAFE Agreements.

However, Mr. Lora and Triarii were unwilling to enter into any of these agreements without a personal guarantee from Mr. Jigolyk for repayment of the $600,000 with said guarantee secured by Mr. Jigolyk's real property in Canada. To this end the parties entered into a separate Personal Asset Backed Security Agreement and Promissory Notes whereby Mr. Jigolyk agreed to personally guarantee Triarii's $600,000 investment and secure the same with his real property located in Alberta, Canada.

The record is undisputed that the benchmarks contemplated in the parties' Personal Asset Backed Security Agreement were not met and Mr. Jigolyk's personal guarantee of $600,000 was due and owed. Triarii made a timely and proper demand for payment which was ignored. Mr. Jigolyk has breached the parties' contract by his failure to pay. Mr. Jigolyk also breached the covenant of good faith and fair dealing by his actions, inactions and conduct during the course of the parties relationship which included his refusal to pay. Finally, Mr. Jigolyk intentionally and fraudulently represented to Triarii and its principal Brian Lora that the Personal Asset Backed Security Agreement and Promissory Notes included a valid and enforceable security agreement in the jurisdiction of Canada which Mr. Lora could rely upon and execute upon in the event of default. This was false and Mr. Lora and Triarii has now had to initiate these proceedings in lieu of a direct foreclosure proceeding in Canada. Triarii seeks both compensatory and punitive damages.

**B.    CHOICE OF LAW.**

The Personal Asset Backed Security Agreement provides that "[t]he choice of law

governing any dispute or claim arising out of or in connection with the Agreement shall be consistent with that set forth in the Investor's Safe, taking into consideration the Security is governed by the Laws of Alberta." (Jigolyk Depo. Ex. No. 5 at RSE 112). Plaintiff Triarii Technology Solutions, Inc. is defined as the "Investor" in the three (3) Simple Equity Agreement for Future Equity (Safe) Agreements. (Jigolyk Depo. Ex. No. 4 at RSE 123). Paragraph 5 (f) of each of the three (3) Safe agreements provides that "[a]ll rights and obligations hereunder will be governed by the laws of the State of [Wyoming], without regard to the conflicts of laws provisions of such jurisdiction." (Jigolyk Depo Ex. Nos. 2, 3 and 4).

## C.    STANDARD OF REVIEW.

This Court is aware of the standard of review on a motion for summary judgment:

> Summary judgment is appropriate where a movant shows "there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a) (emphasis added). "A dispute is genuine if there is sufficient evidence so that a rational trier of fact could resolve the issue either way. A fact is material if under the substantive law it is essential to the proper disposition of the claim." *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011) (internal quotations and citations omitted). "The movant bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998). The burden then shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial. *Id.* "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

*Westchester Fire Ins. Co. v. Interior Partitions, Inc.,* No. 18-CV-34-SWS, 2019 WL 5273956, at *2 (D. Wyo. Mar. 18, 2019).

**D.      STATEMENT OF UNDISPUTED MATERIAL FACTS[1].**

Mr. Brian Lora is the Chief Executive Officer and President for the Plaintiff Triarii Technology Solutions, Inc, a North Carolina corporation. (Lora Aff. at ¶ 2).  Mr. Lora was first introduced to Mr. Peter Sahagen in September of 2020. (Id. at ¶ 3).  Because of Mr. Lora's professional expertise, Mr. Sahagen asked him to invest in, and lead the development and commercialization of, certain intellectual property related to the fractional ownership of residential real property ("IP"). (Id.).

In September of 2020 Mr. Sahagen introduced Mr. Lora to the Defendant Mr. Sean Jigolyk. (Id. at ¶ 4).  During September and October of 2020, Mr. Lora, Mr. Sahagen and Mr. Jigolyk had several web conferences related to the development and commercialization of the IP discussed above. (Id.)

Real Social Equity Corp. (RSE) was a Wyoming corporation Mr. Sahagen had caused to be created in September of 2020 and which he intended as the corporate vehicle to develop and commercialize the IP. (Id. at ¶ 5).  Defendant Mr. Sean Jigolyk was the sole director and owner of RSE. (Id.)  Prior to September of 2020 Mr. Jigolyk individually had also become the owner of the IP pursuant to an asset purchase agreement. (Jigolyk Depo. Ex. No. 10; Lora Aff. at ¶ 5).

In early November of 2020 Mr. Sahagen invited Mr. Lora and others to travel to Costa Rica to engage in due diligence related to RSE and further discuss the development and commercialization of the IP. (Jigolyk Depo. Ex. No. 11; Lora Aff. at ¶ 6).  Mr. Jigolyk appeared by web conference at the meetings. (Id.)  A pilot launch requiring a $5 million dollar seed round

---

[1] Attached is an Appendix which is incorporated by reference and includes the Affidavit of Mr. Brian Lora, Affidavit of Mr. Bren Cargill, portions of the deposition of Defendant Mr. Sean Jigolyk and select exhibits from Mr. Jigolyk's deposition.  This brief cites with specificity to the Affidavit, deposition transcript and exhibits.

of funding was specifically discussed during the meetings as well as a desire for Mr. Lora to invest in RSE. (Jigolyk Depo. Ex. No. 11; Lora Aff. at ¶ 6).  Mr. Jigolyk testified that during the November 2020 meetings in Costa Rica he participated in conversations with Mr. Lora and others that "led up to the . . . promissory notes and the tranches . . . ." (Jigolyk Depo. at p. 33, L. 24 – p. 34, L. 5).

At the end of the four (4) days of meetings Mr. Sahagen approached Mr. Lora and asked if he would consider becoming the CEO for RSE and an investor. (Id. ¶ 7)  Mr. Lora declined. (Id.)  Mr. Sahagen was persistent and represented that Mr. Jigolyk would personally guarantee any investment Mr. Lora made in RSE. (Id. at ¶ 8).  The possibility of a personal guarantee from Mr. Jigolyk made Mr. Lora reconsider the possibility of becoming an investor. (Id.)

Thereafter Mr. Lora began having multiple communications with Mr. Jigolyk directly about a $6 million dollar seed round of funding (instead of $5 million) for a pilot launch of the project and Mr. Jigolyk's willingness to personally guarantee and secure Mr. Lora's investment in the company. (See e.g. Jigolyk Depo. Ex. Nos. 12 and 15; Lora Aff. at ¶ 9.)  Mr. Jigolyk told Mr. Lora in multiple conversations he would personally guarantee Mr. Lora's investment in RSE. (Id. at ¶ 10.)  In this context, Mr. Jigolyk said he would pledge (eighty) 80 acres he owed in Alberta, Canada free and clear as collateral to secure his personal guarantee of Mr. Lora's investment in the event RSE was unable to raise the $6 million of seed money or the pilot launch was unsuccessful. (Id.)

By December 4, 2020, Mr. Jigolyk and Mr. Lora had come to an oral agreement in principle. (Id. at ¶ 11).  This included assurances the intellectual property was part of RSE; Mr. Lora becoming President of RSE immediately and becoming CEO on March 15, 2021; Mr. Lora's company Triarii investing Mr. Lora's $600,000 in RSE as 10% of the $6 million dollar seed

money, and; finally, Mr. Lora, Triarii and others working to raise the additional $5.4 million dollars of seed money and overseeing the pilot launch discussed above. (Id.)

The $600,000 to be invested by Triarii was actually Mr. Lora's personal life savings which he had loaned to Triarii. (Id. at ¶ 13). Triarii's initial $600,000 seed money investment in RSE was structured in three rounds ("tranches") which were to be secured by SAFE agreements ("Simple Agreement for Future Equity"). (Id. at ¶ 12). The schedule for the three tranches was $150,000 by December 4, 2020; $250,000 by March 15, 2021, and $200,000 by June 30, 2021. (Id.)

As a result of the discussions above, on or about December 4, 2020, Triarii Technology Solutions, Inc. entered into the following agreements with Real Social Equity Corp whereby Triarii agreed to invest $600,000 in RSE under terms and conditions therein:

Real Social Equity Corp Seed Round Investment Agreement;

Real Social Equity SAFE (Simple Agreement for Future Equity) ($150,000);

Real Social Equity SAFE (Simple Agreement for Future Equity) ($250,000);

Real Social Equity SAFE (Simple Agreement for Future Equity) ($200,000).

(Id. at ¶ 14; *See also* Jigolyk Depo Exh. Nos. 1-4). The Real Social Equity Corp Seed Round Investment Agreement provided a detailed description of the events described above leading to its execution and outlines the terms and conditions of Triarii' s $600,000 investment in RSE. (Jigolyk Depo. Exh. Nos. 1 and 16[2]; Lora Aff. at ¶ 14).

The SAFE agreements provided a mechanism whereby Triarii's $600,000 investment could be converted into preferred shares following successfully raising the seed capital and a

---

[2] Mr. Jigolyk testified that Deposition Exhibit No. 16 was actually "Attachment B" to the Personal Asset Backed Security Agreement. (Jigolyk Depo. at p. 53, L. 20-25).

successful pilot launch. (Jigolyk Depo. Ex. Nos. 2-4; Lora Aff. at ¶ 16).  On December 4, 2020, Triarii also entered into a Personal Asset Backed Security Agreement with the Defendant Mr. Jigolyk individually for the purpose of guaranteeing and securing repayment of Triarii's $600,000 seed money investment in RSE consistent with the parties' discussions dating back to October. (Jigolyk Depo. Ex. No. 5; Lora Aff. at ¶ 17).

The Personal Asset Backed Security Agreement specifically references Triarii's $600,000 loan, the three (3) SAFE Agreements above and is characterized as a "side agreement" intended to provide a personal guarantee by Mr. Jigolyk secured by his Alberta, Canada real property. (Jigolyk Depo. Ex. No. 5; Lora Aff. at ¶ 18).  Mr. Jigolyk testified that he first provided the template for the Personal Asset Backed Security Agreement and that he "wrote it". (Jigolyk Depo at p. 36, L. 6-17).  Similarly, Mr. Jigolyk also testified he drafted all three promissory notes "from scratch". (Id. at p. 37, L. 14 – p. 38, L. 2).  Mr. Lora has also testified and confirmed that Mr. Jigolyk drafted the Personal Asset Backed Security Agreement and Promissory Notes in question and represented to Mr. Lora they were valid and enforceable under Canadian law. (Lora Aff. at ¶ 21).

Attachment A to the Personal Asset Backed Security Agreement was a Promissory Note signed by Mr. Jigolyk on December 3, 2020 and for the first tranche of $150,000. (Jigolyk Depo. Ex. No. 6; Lora Aff. at ¶ 19).  Mr. Jigolyk also executed two additional and identical Promissory Notes for the second and third tranches in the amounts of $250,000 and $200,000 respectively. (Jigolyk Depo. Ex. Nos. 7 and 8; Lora Aff. at ¶ 19).  The Personal Asset Backed Security Agreement and Promissory Notes purportedly provided a valid and enforceable security interest in Mr. Jigolyk's 80 acres he owned in Alberta, Canada to guarantee re-payment of Triarii's $600,000 in the event the $6 million dollar seed money was not raised or the pilot launch was

7

otherwise not successful within nine (9) months of its launch. (Jigolyk Depo. Ex. No. 5-8; Lora Aff. at ¶ 20).

As a direct and proximate result of Mr. Jigolyk's promises, representations and the written documents drafted and provided by him upon which Mr. Lora relied, Triarii executed the Personal Asset Backed Security Agreement on December 4, 2020. (Lora Aff. at ¶ 23)  Further, as a direct and proximate result of Mr. Jigolyk's promises, representations and the written documents drafted and provided by him upon which Mr. Lora relied, Triarii actually paid the $600,000 of the seed money financing to RSE between December 4, 2020, and June 30, 2021. (Id. at ¶ 23).

The pilot launch was originally scheduled to occur in the summer of 2021 and in ten (10) U.S. cities. (Id. at ¶¶ 24-25).  For practical and logistical reasons, the pilot launch was reduced to just one (1) city, which actually benefited Mr. Jigolyk and his personal guarantee in so far as it would make achieving the pilot launch goal easier. (Id. at ¶ 26).

In putting together the leadership team for RSE Mr. Lora was to serve as CEO and Mr. Jigolyk was to serve as the project manager. (Jigolyk Depo. Ex. No. 24 at TRI 1425; Lora Aff. at ¶ 27).  Mr. Jigolyk testified he was the "project manager" for RSE for "little less than a year" between December of 2020 and November of 2021. (Jigolyk Depo at p. 46, L. 9-16).  As RSE's project manager, Mr. Jigolyk was directly involved in creating the project plan which included the scope, resources, locations and schedules for a successful pilot launch. (Lora Aff. at ¶ 27). Mr. Jigolyk testified that as project manager he was also tasked with fund raising for RSE. (Jigolyk Depo. at p. 149, L. 4-7.)

Throughout his time involved with RSE, Mr. Lora did not take his $250,000 salary as contemplated by his Employment Agreement. (Lora Aff. at ¶ 28).  Mr. Lora did this in an effort to keep expenses down and preserve the initial capital invested by Triarii, thus creating as much

runway as possible to support both the pilot launch as well as completion of the remaining $5.4M of Seed round funding. (Id.)  Mr. Lora also did this thinking Triarii's $600,000 initial capital investment was secured. (Id.)

During the Spring of 2021 Mr. Lora and RSE began attempting to raise seed money as well as other activities to try and ensure a successful pilot launch. (Id. at ¶¶ 30-31; See also Jigolyk Depo. Ex. No. 18 which is the project plan spreadsheet/timeline )  Ultimately, Mr. Lora and RSE began to run into obstacles to raise the outstanding $5.4 million dollars in seed money for the pilot launch. (Lora Aff. at ¶ 32).  These included, but were not limited to, the fact Mr. Jigolyk as project manager frustrated RSE's pilot launch efforts through his lack of ability to effectively direct resources he had brought on to work on the pilot launch. (Id. at ¶ 33).  Specifically, Mr. Jigolyk and the employees he personally hired were unable to complete tasks in a timely fashion. Moreover, he was poorly organized, and he otherwise wasted money and other resources. (Id.) As a result, the pilot launch date was pushed to September of  2021. (Id.)

Despite maintaining optimism in the project, by September of 2021 RSE Mr. Lora had initiated a number of expense reduction strategies due to a lack of progress to raise the remaining $5.4M funding round. (Id. at ¶ 34).  By November of 2021 RSE's funds were minimal and it could no longer make payments to contractors or vendors. (Id. at ¶ 35).   On November 19, 2021, Mr. Jigolyk was removed as the project manager as a cost saving measure. (Id.)  Although Mr. Lora was never paid, Mr. Jigolyk and the Costa Rican resources he provided thru his local company were compensated from Dec 4th, 2020, thru November 19th, 2021. (Id.)

On December 3, 2021, Mr. Mr. Sahagen filed his lawsuit against Mr. Lora and others related to the project which created further obstacles to successful fundraising and the pilot launch. (Id. at ¶ 36).  Notwithstanding the lawsuit and the lack of funding, Mr. Lora continued with the

project as he truly believed in the concept and still believed he could find a lending partner who might be willing to fund their efforts albeit on a reduced scope of a potential launch. (Id. at ¶ 37).

In 2022 Mr. Lora continued to look for potential investors and at times with some promising leads that unfortunately did not materialize. (Id. at ¶ 38).  Mr. Lora continued to fund, thru Triarii, some critical expenses on a month-to-month basis, totaling another $180,000 above and beyond the original Investment Agreement and Personal Asset Backed Security Agreement. (Id.)

In 2022 RSE CFO Tracy Jackson discovered that Mr. Jigolyk had falsified some of his RSE expense reports and in fact owed RSE $6,000-$8,000. (Id. at ¶ 39).  A demand letter was sent to Mr. Jigolyk which he ignored. (Jigolyk Depo. Ex. No. 41; Lora Aff. at ¶ 39). Mr. Jigolyk confirmed he did not reimburse RSE for the money he owed personally. (Jigolyk Depo. at p. 101, L. 8-11.)

In total, RSE was only able to raise approximately $890,000 of seed funding, the majority of which came from Mr. Lora personally and a portion ($75,000) from Ms. Tracy Jackson. (Lora Aff. at ¶ 40).  RSE unfortunately did not come close to raising its goal of $6 million in seed money. (Id.)  As a result, RSE was never able to effectuate a pilot launch in Raleigh, North Carolina, let alone the ten (10) cities originally contemplated in the Personal Asset Backed Security Agreement executed by Mr. Jigolyk. (Id.)

Mr. Jigolyk testified that be believed Mr. Lora, Ms. Jackson and others used their best efforts to try and raise the $6 million to fund the Pilot Launch. (Jigolyk Depo. at p. 145, L. 21, p. 146, L. 1).   )  Mr. Jigolyk further testified that he "believed the efforts made by Mr. Lora and Triarii were reasonable under the circumstances, knowing what you know now [July 18, 2024] versus what you knew in 2021." (Jigolyk Depo. at p. 149, L. 11-20).

By 2023 RSE was completely out of funds and the project was no longer viable for all of the reasons stated above. (Lora Aff. at ¶ 41). Mr. Jigolyk testified and agreed that there was not a successful pilot launch in any city for lack of successful fundraising. (Jigolyk Depo. at p. 22, L. 7-10; p. 24, L. 22-25; p. 84, L. 5-9).

As a result, on February 23, 2023, Triarii sent and demand letter to Mr. Jigolyk for payment of the $600,000 he had promised to pay and which he represented was secured by his real property. (Jigolyk Depo. Ex. No. 9; Lora Aff. at ¶ 41). Mr. Jigolyk ignored the demand and has refused to pay the $600,000. (Id.) The Personal Asset Backed Security Agreement provides that "interest shall match the annual U.S., "Federal Funds Rate" PLUS one per cent (1.0%) simple interest. (Id. at ¶ 43). Mr. Lora has calculated the total interest owed on the $600,000 as being a minimal amount of $31,500. (Id.)

Thereafter Mr. Lora learned that the security portion (real estate) of the Security Agreement and Promissory Notes which Mr. Jigolyk drafted and presented to him were not directly enforceable in Alberta, Canada and Mr. Lora could not simply initiate foreclose proceedings on Mr. Jigolyk's real property to collect the $600,000. (Id. at ¶ 42). Instead, Mr. Lora learned he must first obtain a Judgment here in the jurisdiction of Wyoming which he can then record in Alberta, Canada. (Id.) Mr. Jigolyk's real property (and other assets) will then be subject to attachment for collection purposes. (Id.) Edmonton Alberta attorney Bren Cargill has provided expert opinion testimony that the Security Agreement and Promissory Notes drafted and tendered by Mr. Jigolyk are not enforceable security agreements in Alberta, Canada. (Aff. of Bren Cargill and Expert Report found at Doc. 26-2).

In total, Mr. Lora is claiming damages, both compensatory and punitive in the amount of $1,085,413.30 ($600,000 principal + $31,500 interest + $23,913.20 attorney's fees and costs + $180,000 additional investment + $250,000 foregone salary) (Lora Aff. at ¶ 45).

**E.    DISCUSSION.**

    1.    <u>Mr. Jigolyk breached the parties' Personal Asset Backed Security Agreement</u>.

For a contract to be valid, "[t]here must be an offer and acceptance along with bargained for and exchanged valuable consideration." *Carroll v. Bergen*, 2002 WY 166, ¶ 12, 57 P.3d 1209, 1214 (Wyo. 2002). "To establish a prima facie case for breach of contract, a plaintiff must show: (1) "a lawfully enforceable contract," (2) "an unjustified failure to timely perform all or any part of what is promised therein," and (3) "entitlement of [the] injured party to damages." Kappes v. Rhodes, 2022 WY 82, ¶ 17, 512 P.3d 31, 36 (Wyo. 2022) (citations omitted.); *Schlinger v. McGhee*, 2012 WY 7, ¶ 12, 268 P.3d 264, 268 (Wyo. 2012). The Wyoming Supreme Court has set forth the standard for interpretation of contracts as a matter of law:

> The primary purpose in interpreting or construing a contract is to determine the intent of the parties. The interpretation and construction of a contract are done by the court as a matter of law. Where an agreement is in writing and the language is clear and unambiguous, the intent of the parties is to be secured from the words of the contract. The contract as a whole should be considered, taking into consideration the relationship between the various parts.

*Cliff & Co. v. Anderson*, 777 P.2d 595, 598 (Wyo. 1989) (citations omitted).

The "language of the parties expressed in their contract must be given effect in accordance with the meaning which that language would convey to reasonable persons at the time and place of its use*." Ultra Res., Inc. v. Hartman*, 2010 WY 36, ¶ 22, 226 P.3d 889, 905 (Wyo. 2010) (citations omitted). In this context, the Courts shall "employ common sense in interpreting contracts and ascribe the words with a rational and reasonable intent. *Id.* Finally, "[c]ourts should

consider the circumstances surrounding execution of the agreement to determine the parties' intention, even in reviewing unambiguous contracts. *Id.*; *Smith v. B&G Royalties*, 2020 WY 106, ¶ 9, 469 P.3d 1206, 1211 (Wyo. 2020) (""Extrinsic evidence can be considered in interpreting an unambiguous contract to the extent it involves facts and circumstances surrounding execution of the contract.")

In September of 2020 Mr. Sahagen introduced Mr. Lora to the Defendant Mr. Sean Jigolyk. Defendant Mr. Jigolyk was the owner of both Real Social Equity Corp. ("RSE") and the valuable intellectual property ("IP"). During September and October of 2020, Mr. Lora, Mr. Sahagen and Mr. Jigolyk had several web conferences related to the development and commercialization of the IP discussed above.

In early November of 2020 Mr. Sahagen invited Mr. Lora and others to travel to Costa Rica to engage in due diligence related to RSE and further discuss the development and commercialization of the IP. Mr. Jigolyk appeared by web conference at the meetings. A pilot launch requiring a $5 million dollar seed round of funding was specifically discussed during the meetings as well as a desire for Mr. Lora to invest in RSE.

At the end of the four (4) days of meetings Mr. Lora was approached and asked if he would consider becoming the CEO for RSE and an investor. Mr. Lora declined. In response Mr. Sahagen represented that Mr. Jigolyk would personally guarantee any investment Mr. Lora made in RSE. The possibility of a personal guarantee from Mr. Jigolyk made Mr. Lora reconsider the possibility of becoming an investor.

Mr. Jigolyk confirmed that the offer was discussed when he testified that during the November 2020 meetings in Costa Rica he participated in conversations with Mr. Lora and others that "led up to the . . . promissory notes and the tranches . . . ." (Jigolyk Depo. at p. 33, L. 24 – p.

34, L. 5). As a result of those undisputed negotiations Mr. Jigolyk drafted the Personal Asset Backed Security Agreement and the three (3) Promissory Notes attached thereto. All parties signed said agreement thereby constituting both a valid offer and acceptance.

The consideration was also valuable and undisputed. Mr. Jigolyk and his company RSE obtained a valuable, experienced and well-trained professional to lead their project in Triarii's principal Mr. Lora. Mr. Jigolyk and his company RSE also obtained $600,000 of seed money to put towards the pilot launch for said project. There is no genuine issue of material fact in dispute that Personal Asset Backed Security Agreement is a valid and enforceable contract supported by adequate consideration.

As to breach, the relevant portion of the Personal Asset Backed Security Agreement provides that

> The Promissory Note(s), along with any accumulated interest . . . shall automatically terminate and become null and void upon the earlier of (i) the closing of the $6 million RSEC SEED Round Equity Financing; or (ii) immediately following the completion of "The Pilot Launch" for Real Social Equity in up to ten (10) cities. For purposes of clarity, it is expected that "The Pilot Launch" will conclude within 9 months of the start of "the Pilot Launch", . . .

Conversely, in the absence of raising $6 million or a pilot becoming successful within nine (9) months of launch, the full $600,000 including interest was due and shall be paid by Mr. Jigolyk.

There is no dispute that the $6 million in seed money was not raised and there was never any pilot launch, let alone a successful pilot launch nine (9) months after launch. Mr. Lora has testified at length as to the efforts he and others took for more than two (2) years to raise the seed money leading to a potentially successful pilot launch in at least one (1) city. Mr. Lora testified that neither the $6 million dollars in seed money was achieved and no pilot launch ever occurred. **During his deposition Mr. Jigolyk agreed that the $6 million was not raised and there was**

**no pilot launch**.  (emphasis added).

On this basis alone there is no genuine issue of material fact in dispute that the conditions precedent to relieving Mr. Jigolyk from paying the $600,000 plus interest were not met.  Therefore, the money was owed and Mr. Jigolyk has refused to pay despite a timely and proper written demand.  There is no genuine issue of material fact in dispute that Mr. Jigolyk is in fact in breach of contract for failure to perform and a summary judgment should be entered against him for the $600,000 principal and $31,500 of interest to date.

In addition, the Real Social Equity Corp Seed Round Investment Agreement executed in conjunction with both the three SAFE Agreements and the Personal Asset Backed Security Agreement, included a prevailing party attorney's fees and costs clause.  Mr. Lora has testified that he has spent $23,913.20 in attorney's fees and costs as of August 19, 2024 to prosecute this case.  As the prevailing party Triarii should also be awarded its fees and costs in the amount of $23,913.20 as contractual damages in that amount and be given leave to supplement this request for the fees and costs associated with having to prosecute this current motion for summary judgment.

During his deposition Mr. Jigolyk testified that he was only obligated to repay the promissory notes in the event the $6 million in seed money was raised or the ten-city pilot launch was actually achieved. (Jigolyk Depo at p. 16, L. 11- p. 17, L. 2).  Mr. Jigolyk apparently believes he was relieved from paying the $600,000 including interest because the seed money was not raised and the pilot launch was not successful.  This is nonsense and antithetical to the very concept of a personal guarantee.

Again, the testimony is undisputed that Mr. Lora and Triarii wanted the $600,000 to be guaranteed and secured by real property and this is what the parties discussed in the months leading

up to the execution of the documents.  The very purpose of the Personal Asset Backed Security Agreement was to guarantee repayment of the $600,000 in the event the project was unsuccessful and the plain language of that agreement reflects the same.  Instead, Mr. Jigolyk is encouraging an interpretation of a contract he drafted so that his promissory notes would be "null and void" if the seed money effort and pilot launch were **not** successful.(emphasis added).  By definition this is not a personal guarantee and again contrary to the plain language of the agreement.

It is telling that Mr. Jigolyk himself changed his testimony later in the deposition and consistent with the plain language of the Security Agreement and common sense.  Mr. Jigolyk was specifically asked whether the $600,000 "was secured or collateralized by your land vis-à-vis the promissory notes and the agreement" (Jigolyk Depo. at p. 152, L. 15-18).  Mr. Jigolyk responded "Correct. For a limited amount of time while the corporation was coming to the Pilot Launch." (Id. at p. 152, L. 19-21.)  By his own testimony Mr. Jigolyk admitted the "Pilot Launch" never occurred.  Therefore, by his own admission, the $600,000 including interest is owed.  Again, there is no genuine issue of material fact in dispute the parties enjoyed a valid, enforceable agreement and Mr. Jigolyk breached that agreement by failing to pay thereby causing Plaintiff Triarii damages.  As such, Triarii respectfully requests the Court enter a summary judgment in its favor on its breach of contract claim.

> 2.    Mr. Jigolyk intentionally misrepresented his intent to provide a valid and enforceable security interest in his Canadian property thereby committing fraud.

The elements of intentional misrepresentation (fraud) require Triarii to prove by clear and convincing evidence:

(1)    Mr. Jigolyk made a false representation intended to induce action by Triarii;

(2)    Triarii reasonably believed the representation to be true; and

16

(3)    Triarii relied on the false representation and suffered damages.

*Birt v. Wells Fargo Home Mortg., Inc*., 2003 WY 102, ¶ 42, 75 P.3d 640, 656 (Wyo. 2003).

Clear and convincing evidence is that kind of proof which would persuade you that the truth of the contention is highly probable. *TF v. Dep't of Family Serv.,* 2005 WY 118, ¶ 11, 120 P.3d 992, 999 (Wyo.2005) *quoting Hutchins v. Payless Auto Sales, Inc.,* 2002 WY 8, ¶ 19, 38 P.3d 1057, 1063 (Wyo.2002)).  When considering whether clear and convincing evidence has been presented, the Wyoming Supreme Court has recognized that "[c]onduct or words which tend to produce an erroneous impression may satisfy the plaintiff's burden." *Rogers v. Wright,* 2016 WY 10, ¶ 13, 366 P.3d 1264, 1271 (Wyo. 2016); *Claman v. Popp,* 2012 WY 92, ¶ 43, 279 P.3d 1003, 1016 (Wyo. 2012).

The evidence is undisputed that Mr. Lora and Mr. Jigolyk had multiple communications about a $6 million dollar seed round of funding for a pilot launch of the project.  The evidence is also undisputed that Mr. Lora had no interest in involving himself or Triarii in this project professionally or financially absent a secured, personal guarantee.  When Mr. Jigolyk committed to the secured, personal guarantee, it was obviously intended to lure Mr. Lora's investment of $600,000 as well as to bring Mr. Lora's significant expertise and  fund-raising credibility to the project.  The record is undisputed that in these conversations Mr. Jigolyk confirmed he would he not just personally guarantee Mr. Lora's investment in RSE but would secure and collateralize that guarantee with (eighty) 80 acres owned free and clear by Mr. Jigolyk in Alberta, Canada in the event the parties could not raise the $6 million or the pilot launch was unsuccessful.

As result of the parties' negotiations, Mr. Jigolyk drafted the Personal Asset Backed Security Agreement and three (3) Promissory Notes attached thereto and which purportedly included and represented a valid and enforceable security agreement in Mr. Jigolyk's real property

in favor of Triarii.  This was not true.  Mr. Lora has testified that his efforts to try and foreclose on the Promissory Notes in Canada have been unsuccessful.  Mr. Bren Cargill has provided expert opinion testimony that in fact the Security Agreement and Promissory Notes are not valid and enforceable security instruments in Alberta, Canada. (See Aff. of Bren Cargill and his Expert Report found at Doc 26 and 26-1).

In summary, there is no genuine issue of material fact in dispute as proven by clear and convincing evidence that Mr. Jigolyk made false representations to Mr. Lora and Triarii which were intended for them to become financially and professionally involved in RSE's project. There is further no genuine issue of material fact in dispute that Mr. Lora and Triarii reasonably believed Mr. Jigolyk's representations to be true under the circumstances and that Mr. Lora and Triarii relied upon those false representations causing Triarii damages.

Damages for fraud include any loss suffered as a result of the Plaintiff's reliance upon the Defendant's false representations. *Alexander v. Meduna*, 2002 WY 83, ¶ 36, 47 P.3d 206, 217 (Wyo. 2002).  As discussed above, this is the $600,000 principal, $31,500 in interest and $23,913.20 in attorney's fees and costs.

Triarii has also plead punitive damages in its *Complaint*.  Proof of fraud may allow the award of punitive damages which includes attorney's fees. *See Alexander v. Meduna*, 2002 WY 83, ¶¶ 39-41, 49 P.3d 206 (Wyo. 2002).

Punitive damages are not compensatory damages and instead are intended to punish a defendant and deter others from such future conduct. *Alexander v. Meduna*, 2002 WY 83, ¶ 40, 47 P.3d 206, 218 (Wyo. 2002).  Punitive damages require proof of willful and wanton misconduct. *Id.* at ¶ 41.  "Willful and wanton misconduct is the intentional doing of an act, or an intentional failure to do an act, in reckless disregard of the consequences, and under such circumstances and

conditions that a reasonable person would know, or have reason to know, that such conduct would, with a high degree of probability, result in harm to another." *Cramer v. Powder River Coal, LLC*, 2009 WY 45, ¶ 17, 204 P.3d 974, 979 (Wyo. 2009).

In attempting to decide whether to impose punitive damages Wyoming has adopted a seven-part test which asks the following:

> (1) Punitive damages should bear a reasonable relationship to the harm that is likely to occur from the defendant's conduct as well as to the harm that actually has occurred. If the actual or likely harm is slight, the damages should be relatively small. If grievous, the damages should be much greater.

> (2) The degree of reprehensibility of the defendant's conduct should be considered. The duration of this conduct, the degree of the defendant's awareness of any hazard which his conduct has caused or is likely to cause, and any concealment or 'cover-up' of that hazard, and the existence and frequency of similar past conduct should all be relevant in determining this degree of reprehensibility.

> (3) If the wrongful conduct was profitable to the defendant, the punitive damages should remove the profit and should be in excess of the profit, so that the defendant recognizes a loss.

> (4) The financial position of the defendant would be relevant.

> (5) All the costs of litigation should be included, so as to encourage plaintiffs to bring wrongdoers to trial.

> (6) If criminal sanctions have been imposed on the defendant for his conduct, this should be taken into account in mitigation of the punitive damages award.

> (7) If there have been other civil actions against the same defendant, based on the same conduct, this should be taken into account in mitigation of the punitive damages award.

*Alexander v. Meduna*, 2002 WY 83, ¶ 42, 47 P.3d 206, 219 (Wyo. 2002).

At the heart of the agreement between RSE, Mr. Jigolyk and Triarii was the personal guarantee. Mr. Jigolyk and Mr. Sahagen were looking not just for a professional executive to run RSE's fund-raising efforts and pilot launch, but also seed money for said pilot launch. Mr. Lora

unequivocally testified he was not interested in participating in either unless there was a personal, secured guarantee of his life-savings which he loaned to Triarii.

In response Mr. Jigolyk lied to Mr. Lora.  Mr. Jigolyk tendered a personal guarantee secured by his real property that was not legally enforceable in Alberta, Canada.  This lie caused Mr. Lora to work for more than two years of his life, uncompensated and contribute $600,000 of his life-savings to Mr. Jigolyk's company RSE.  The only explanation for Mr. Jigolyk's actions are greed.  He simply was not willing to put any "skin in the game" despite his express representations to the contrary.

Mr. Jigolyk could have cured his malfeasance by simply paying the $600,000 plus interest when confronted with the written demand in February of 2023.  He did not do that.  Instead, during his deposition he offered a nonsensical interpretation of his own agreement in his on-going effort to avoid responsibility and protect himself financially.

It is in this context five of the seven factors for imposing punitive damages are present. The amount of punitive damages include $23,913.20 of attorney's fees and costs (if not otherwise awarded as discussed above), an additional $180,000 of personal investment by Mr. Lora in Mr. Jigolyk's company and $250,000 of salary Mr. Lora forewent to the benefit of RSE and Mr. Jigolyk.  The punitive damages requested have a "reasonable relationship" to the harm caused by Mr. Jigolyk as discussed above and the amount requested is proportional to the amount of actual compensatory damages in that it is less than $600,000.

Further, this was a fraudulent scheme by Mr. Jigolyk to induce Mr. Lora to not only work for free, but also contribute $600,000 of his own money to potentially enrich Mr. Jigolyk vis-à-vis his company RSE. Mr. Jigolyk is the one who drafted the documents at issue and is the person who represented they were valid security instruments.  Mr. Jigolyk lied to Mr. Lora and the lie

continued for years while Mr. Lora worked for RSE. It is particularly galling to Mr. Lora that Mr. Jigolyk was actually paid a salary from the $600,000 seed money invested by Triarii. In this context Mr. Jigolyk's conduct was reprehensible and profitable to him individually.

Mr. Jigolyk was afforded the opportunity to perform on the contract he drafted and cure his failure to provide an enforceable security agreement when he was presented with the demand for payment in February of 2023. He unreasonably declined forcing Mr. Lora to initiate these expensive legal proceedings. This is precisely the scenario Mr. Lora was attempting to avoid by unequivocally stating in 2020 he would require a personal, secured guarantee for his involvement.

In his defense Mr. Jigolyk has offered a facially unserious explanation which he even contradicted in his own deposition. Mr. Jigolyk's course of conduct since 2020 sheds light on his motives and intent. He was never going to pay Triarii and Mr. Lora and instead enjoyed their services and money without consequence to date.

In summary, punitive damages are warranted and should include the cost of the litigation if not already awarded ($23,913.20); Mr. Lora's additional $180,000 investment in the RSE project above his original $600,000 and his $250,000 salary which he had foregone.

3.    Mr. Jigolyk breached the implied covenant of good faith and fair dealing.

In Wyoming "every contract imposes upon each part a duty of good faith and fair dealing in its performance and its enforcement." *Wilcox v. Sec. State Bank*, 2023 WY 2, ¶ 50, 523 P.3d 277, 289 (Wyo. 2023), *reh'g denied* (Feb. 14, 2023) (citations omitted). In defining the claim, the Wyoming Supreme Court has held

> The implied covenant of good faith and fair dealing requires that neither party commit an act that would injure the rights of the other party to receive the benefit of their agreement. Compliance with the obligation to perform a contract in good faith requires that a party's actions be consistent with the agreed common purpose and justified expectations of the other party. A breach of the covenant of good faith

21

and fair dealing occurs when a party interferes or fails to cooperate in the other party's performance. The purpose, intentions, and expectations of the parties should be determined by considering the contract language and the course of dealings between and conduct of the parties. The covenant of good faith and fair dealing may not, however, be construed to establish new, independent rights or duties not agreed upon by the parties. In other words, the concept of good faith and fair dealing is not a limitless one. The implied obligation must arise from the language used or it must be indispensable to effectuate the intention of the parties. In the absence of evidence of self-dealing or breach of community standards of decency, fairness or reasonableness, the exercise of contractual rights alone will not be considered a breach of the covenant.

*Id.*   Breach of contract claims and breach of the implied covenant of good faith and fair dealing claim are not "mutually dependent" and one can occur without the other. *Id.*

Mr. Lora has testified that the parties had agreed that Mr. Jigolyk would collateralize and secure his personal guarantee with his real property in Canada. To this end Mr. Jigolyk purported to tender a valid and enforceable security interest in that property.  He did not.  Mr. Bren Cargill is an Alberta, Canada attorney who has provided expert, opinion testimony that the purported security agreement in the real property is simply not enforceable in Alberta, Canada. (See Aff. of Bren Cargill and Expert Report at Doc. 26-2)  As such, Mr. Lora has been precluded from directly foreclosing against the property in Canada to collect the $600,000 including interest and instead been forced to initiate these expensive legal proceedings in Wyoming to obtain a Judgment which can then be recorded in Alberta, Canada for purposes of collection.  This act alone was a breach of the implied covenant of good faith and fair dealing.

The second act occurred when Mr. Jigolyk ignored the demand for payment and performance on the agreements he drafted despite the fact he has admitted the $6 million seed money was never raised and there was never a successful pilot launch.  Instead, Mr. Jigolyk has asserted a nonsensical interpretation of his own agreements to simply avoid performing by paying.  This again is a breach of the implied covenant of good faith and fair dealing in which there is no

genuine issue of material fact in dispute.

Damages for breach of the implied covenant of good faith and fair dealing include compensatory damages as discussed above ($600,000 principal, $31,500 interest and $23,913.20 attorney's fees). *See City of Gillette v. Hladky Const., Inc.*, 2008 WY 134, ¶ 78, 196 P.3d 184, 206 (Wyo. 2008)  However, Triarii has also plead punitive damages which are also contemplated as potential damages for a breach of the implied covenant of good faith and fair dealing. *Wilder v. Cody Country Chamber of Com*, 868 P.2d 211, 222 (Wyo. 1994); *Cathcart v. State Farm Mut. Auto. Ins. Co.*, 2005 WY 154, ¶ 24, 123 P.3d 579, 589 (Wyo. 2005).

As discussed in Section 2 above, Triarii seeks punitive damages including the cost of the litigation if not already awarded ($23,913.20); Mr. Lora's additional $180,000 investment in the RSE project above his original $600,000 and his $250,000 salary which he had foregone.  The arguments as to punitive damages from Section 2 above are incorporated by reference.

## F.    CONCLUSION.

WHEREFORE, Plaintiff Triarii Technology Solutions, Inc. respectfully request that the District Court grant summary judgment in its favor as to all claims for relief.

DATED this 30th day of August, 2024.

  /s/ Jason M. Tangeman          
Jason M. Tangeman, WSB 6-3082
Mitchell H. Edwards, WSB 6-3880
Kenna J. Blaney, WSB 8-7098
NICHOLAS & TANGEMAN, LLC
170 North Fifth Street, P. O. Box 928
Laramie, WY 82073-0928
Phone: (307) 742-7140
Fax: (307) 742-7160
jtangeman@wyolegal.com
edwardsm@wyolegal.com
kblaney@wyolegal.com

**CERTIFICATE OF SERVICE**

I hereby certify that, on August 30, 2024, I electronically transmitted the foregoing document to the Clerk of the Court using the CM/ECF System for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to all registered counsel of record.

_____/s/ Jason M. Tangeman_____